THE STATE, ON THE RELATION OF THE BOARD OF HEALTH
OF HACKENSACK,

*v.*

THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY
OF BERGEN.

The relators, in a bill filed by the State under the twenty-eighth and twenty-ninth sections of the act of March 31st, 1887 (*P. L. p. 93*), to abate a nuisance as dangerous to the public health, must show that the situation or practice complained of amounts, of itself and without the aid of other similar practices or situations (for which the defendants are not responsible), to a *public* as distinguished from a *private* nuisance, and one which would be indictable as such. A mere tendency to injury is not sufficient to constitute such a nuisance. There must be something actually appreciable, which arrests the attention and rests not merely in theory, but strikes the common sense of the ordinary citizen.

On bill, answer and proofs taken in open court.

*Mr. Skinner,* for the complainant.

*Mr. Campbell* and *Mr. Dutton,* for the defendan'

PITNEY, V. C.

The bill is filed in the name of the State by the Board of Health of Hackensack, as relators, against the Board of Chosen Freeholders of Bergen County, under the authority of the twenty-eighth and twenty-ninth sections of the act to establish boards of health &c., of March 31st, 1887 (*P. L. p. 93*). It alleges that the relators are the local board of health of the town of Hackensack, in Bergen county, duly appointed and organized by the Hackensack Improvement Commission, which is the local municipal government of the town of Hackensack. It charges the defendant with creating and maintaining in and about the court-house, jail and other public county buildings a nuisance which is within the limits of the municipality of Hackensack, and which is hazardous to the public health. The bill

sets forth in detail the particulars of the alleged nuisance, which, as therein set forth, and as proved, are briefly as follows : Hackensack is the county seat of Bergen county; it contains about five thousand inhabitants, and is situate on the west bank of the Hackensack river, which is a tidal stream emptying into the Newark bay.  There is a stream of water in Hackensack which rises in the northwest portion of the town and runs at first southerly and about parallel with the general course of the Hackensack river for about seventeen hundred yards, where it is joined by the Riser ditch, and first meets the influence of the ocean tides, and thence runs easterly about one thousand yards to the river.  Over this last reach it is influenced by the ebb and flow of the tide, and is called Hackensack creek, and traverses a thickly-populated district of the town.  At its head it is a very small rivulet, nearly dry in dry weather.  From the head of tidal influence to the river it gradually increases in width and depth at high water until at its mouth it is over one hundred feet wide.  About twelve hundred feet from the river it is crossed by Main street by a bridge.  Just below the bridge it is about thirty feet wide and three feet deep, and is navigable for small sloops and schooners.  The bill further alleges that the inhabitants along this reach and above the bridge have for many years used, and still use, the river as a sewer, and thereby render it foul and noxious and hazardous to the public health.  That the population of the town is increasing, and since the introduction of water under pressure about twenty-five years ago the use of water-closets has increased, and, with them, the amount of sewage delivered in the creek.  That the relators in the due exercise of their powers, in October, 1886, and again in June, 1887, passed ordinances forbidding, by apt language, any delivery or deposit of sewage matter in the creek.  The county buildings are located on a lot abutting on the creek and facing on Court street, about eight hundred feet distant from the river.  Opposite the county buildings the creek at high water is about sixty feet wide and about four feet deep, and the sewage of the sheriff's family and the inmates of the jail, jurymen, suitors and witnesses attending court, and persons employed in and attending on busi-

ness at the clerk's, sheriff's and surrogate's offices, is discharged into the creek at this point.

Few, if any, of the inhabitants along the creek obeyed the ordinances of the relators forbidding the use of the creek as a. sewer. A special notice of the alleged nuisance was given to, and request made of, the board of chosen freeholders to desist from such use, and they, after consideration, declined to accede to the demand of the relators, and hence this suit.

The bill, after stating that the use of the creek as a sewer by the inhabitants generally created a nuisance which is hazardous to the public health, continues by charging "that the use of said sink, water-closets, pipes, privies and privy vaults in and about said court-house, jail, surrogate's office and county clerk's office, in connection with said creek and the waters thereof, *has greatly contributed* and does greatly contribute to the creation, continuance and maintenance of the public nuisance aforesaid, and *is of itself and without reference to the use of said creek and its waters at other points in its course through said village greatly hazardous and dangerous to the public health,* and is to the injury and common nuisance of all the people of this State, and particularly to such of them as live within the jurisdiction of said Hackensack Improvement Commission, within which jurisdiction the said relator is invested with the powers and authority hereinbefore set forth."

There is a prayer for abatement and injunction.

The answer calls in question the power and authority of the relators by denying that the Hackensack commission is a municipal body authorized by law to organize a board of health, and hence, it insists, that the relator has no legal existence or authority, and no standing in the court. It also denies that any nuisance has been created or exists as stated in the bill; it admits that the sewage from the county buildings is emptied into the creek substantially as alleged in the bill, but denies that such disposition of it has ever at any time created any nuisance, and alleges that no other practical method exists for disposing of such sewage, and that it is necessary for the defendant to use the creek in the manner it has been doing.

As to the first defence set up in the answer, and relied upon at the hearing, namely, that the relators are without legal exist-. ence, I think the defendants must fail. I think the Hackensack Improvement Commission constitutes a local municipal govern- ment or governing body such as is mentioned in sections nine and eleven of the act of 1887.

I refer to *State* v. *Hackensack, 16 Vr. 113.* And I farther think that the relators were duly appointed a local board of. health for Hackensack, and that they had the right to make the ordinances set out in the bill. But that does not make out complainant's case, as their counsel freely admitted on the argument. There still remain the serious questions in the cause, namely :

*First.* Does the use of this creek for sewage purposes by the inmates of, and visitors to, the county buildings, in the language of the bill, "greatly contribute to the creation and continuance and maintenance of a public nuisance," and is "such use of itself and without reference to the use of said creek and its water at other points hazardous and dangerous to the public health, and is it a public nuisance ?" And, if so, then

*Second.* Is it practically impossible for the defendants to otherwise dispose of the sewage in those buildings in such a manner as to lessen the nuisance and do less injury to the public ? And

*Third.* If it be so practically impossible, then ought this court to restrain the present mode of disposing of it ?

The relators, at the hearing, undertook, and very properly, as I think, the burden of maintaining by proof the affirmative of these propositions of fact. In this they relied upon and followed the case of *The Board of Health of Trenton* v. *Hutchinson, 12 Stew. Eq. 218,* as a precedent. That suit was based upon the statute of March 22d, 1883 (*P. L. p. 119*). The ninth and tenth sections of that act, though clothed in somewhat different language, amount, in substance, to the provisions of the twenty-eighth and twenty-ninth sections of the act of 1887, and the court of appeals in construing them used this language : "By the tenth section of this act power is given to certain local boards of health to file a bill in equity as relators in the name of the

State for an injunction to prohibit the continuance of nuisances hazardous to public health." This language is a condensed paraphrase of the provisions of the twenty-eighth and twenty-ninth sections of the act of 1887, under which this bill is filed.

An examination of the Trenton case shows that both this court and the court of appeals found, as a matter of fact, that the effect of the continuous discharge of the American House sewage into Petty's run was of itself, and without the aid of any other contributions of sewage, sufficient to create a nuisance hazardous to public health. And I do not understand that the statute contemplates or authorizes the interference of this court against the individual infringement of ordinances of the board of health where such infringement is not enough by itself to create a nuisance hazardous to public health, although it may be there are many such infringements which, combined, do result in such a nuisance. And, as before remarked, no such contention was made at the hearing.

In reviewing the mass of testimony given at the hearing, I therefore inquired whether what has been and is being done in and about the county buildings of itself creates a nuisance hazardous to public health. In so doing I have tried to apply the following test, which seems to me to be sufficiently severe as against the defendants: Take the conditions of the court-house buildings, the amount of land occupied by them, the amount of sewage thence emptied into the creek, the breadth and depth of the creek opposite the buildings at high and low tide, their distance from the Hackensack river; if there were any number, say twenty, such establishments as close together as the conditions would permit, would they all combined create such a nuisance?

But right here we meet the difficulty inherent in the very nature of the case, of defining just what degree of injurious influence must be reached in order to warrant the court in pronouncing a situation of this nature to be a nuisance. It seems clear enough that it must be a *public* as distinguished from a mere *private* nuisance; that it must affect a considerable number of persons; and it would seem to follow with equal certainty

that it must be such as would be *indictable* at common law.  It has been well remarked that every living creature is, in a sense, and to a certain degree, a nuisance to any other creature who approaches him.  Every breath we draw, every fire we burn, even the dust we raise in walking, tends to vitiate the air and render it less invigorating to ourselves and neighbors; every function of our body produces poison; mankind cannot congregate and act out their nature as social beings without injuring one another; and the result is shown in the death rates of crowded cities and towns, as compared with that of the sparsely populated country.  It follows that a mere tendency to injury is not sufficient.  There must be something actually appreciable which of itself arrests the attention, that rests not merely in theory, but strikes the common sense of the ordinary citizen.  For instance, I suppose no one would contend that the deposit daily of the waste of one full-grown man in any particular part of the Hackensack creek would create a nuisance, and yet one could hardly doubt that the deposit of that of one hundred men in some one place in the upper reach of that creek might amount to a serious nuisance.  Now where, between these two extremes, is the limit?  I can only answer, it must be a matter to be determined by sound judgment and common sense in each case.

Let us turn now to the case in hand and the evidence.  It is common knowledge that one of the most efficient modes of neutralizing and disposing of sewage is to dilute it highly with water; in other words, to discharge it into a river or other mass of water.  One of the offices of this element seems to be that of a universal cleanser.  Nature's baths are brooks and streams.  They are the natural sewers of the country.  Man and animals wash in them, the rains carry into them the filth from the adjoining country, and their flow carries it to the sea.  The flow of the tide twice a day brings into the bays and inlets a clean supply of water and the ebb carries it back to the sea laden with more or less of the filth brought down by the rivers.  The dilution goes on higher and still higher, until, in the ocean, all trace of filth is lost.  This is nature's process.  The sewage of a large portion of Hackensack is carried in sewers built and maintained by the

local government into the Hackensack river. In this they simply repeat what is done in thousands of other towns and cities in all parts of the civilized world. The only question ever raised in such cases is : Is the river or bay large enough to properly dilute and carry off the sewage ? The Hackensack river is many miles from Newark bay, and in dry weather the flow of fresh water in the river very often is comparatively small, so that the sewage diluted by the waters of the river must be carried up and down its channel by the tide many times before it reaches the bay. And yet it would seem that no nuisance, hazardous or not hazardous to the public health, results from its presence in the river.

By a cross-section measurement of the creek opposite the county buildings it appears that at high tide it is over fifty feet wide, with an average depth of at least three and a half feet. This makes the cross-section area at least one hundred and seventy-five square feet, which, multiplied by one hundred and seventy feet —the length of the frontage on the river of the county lot—produces about thirty thousand cubic feet, or two hundred and twenty-five thousand gallons of water contained in the prism of the river opposite those buildings, and which comes up from and returns to the river twice a day, receiving and carrying away the filth in question. To this mass of water is added, of course, the large amount which flows past the county buildings into the upper reaches of the creek and in due course returns again to the river.

Now, suppose there were another such establishment as the county buildings, occupying the same amount of frontage on the opposite side of the creek, would the amount of sewage delivered by the two into that quantity of water, changed twice a day by the tides, produce a nuisance dangerous to public health ? It seems to me that that is the precise question of fact before me, and that the burden was on the relators to prove the affirmative of it.

Counsel for complainant distinctly assumed such burden at the hearing. If now we come to the actual proofs of injury adduced by the relators, they will be found to refer almost entirely to the general condition of the creek in its whole length and the num-

ber of sewage connections made with and emptying into it. Of these, including privies built over it, there are nearly or quite one hundred, most of them above the Main street bridge in the upper two-thirds and narrower and shallower parts of the tidal reach. In fact, there are only one or two dwellings on the creek between the court-house and river, a large part of that space being occupied by lumber and coal yards. Besides this contribution, it has been a general receptacle of kitchen-water and garbage, decayed vegetables, dead animals and the like, and its course has been obstructed by tin cans and other objects which tended to arrest and hold on its bottom and sides the filthy matter, and prevent its being carried by the tide into the river. Moreover, it has received the wash of several streets which empty into it. Under this treatment it has from time to time and after each cleansing, whether by hand or by rains, become foul, and in dry weather offensive, in the upper tidal reach. But even with all this, I think the weight of the evidence is, that its neighborhood is quite as healthy as any other part of the town, and the physicians agree that they have been unable to trace any particular disease to it as a cause. One or two cases of typhoid fever arose in its neighborhood, but the physician in attendance, upon examination, found the water from the well in the yard used by the patients to be foul from soakage from neighboring privies, the soil being sandy and porous. In one or two instances, general illness of an individual was possibly attributable to proximity to the creek. But this was a long distance from the court-house. The evidence of the experts was to the effect, and in my judgment clearly established, that the *tendency* of such general use of the creek as a sewer was to produce sickness, throat diseases and the like, and a general drain upon the vital energies of the inhabitants. But no witness testified that the sewage contributed to the creek by the county buildings, in the manner and at the place above stated, was by itself, in any appreciable degree, hazardous to the public health. The theory of the relators was, that some of the offensive matter discharged from the public buildings into the river floated on the surface and was carried up stream by the flood tide and lodged along the banks and set-

-tled on the sides and bottom of the upper reaches of the creek, .and contributed in a small degree to the general filth of that part of the stream ; and the large number of persons using the privy appliances of the county buildings was referred to in this connection.    The proof was, that the only water-closets on the premises were those in the jail and court-house, which were used by an average of about twenty-five persons daily.    The jurors, witnesses and other persons attending court, and having business with the clerk and surrogate, made use of two ordinary privies on the banks of the creek, with vaults beneath them, which vaults had small openings in the side next the creek, and, as I under-.stood the evidence, about half way between high and low-water mark, through which the waters of the creek entered them dur-ing flood tide and receded at ebb tide.    It follows from this .situation that whatever was carried out from those privy vaults found its exit during ebb tide and would naturally flow down stream to the river, and not up stream into the populous part of the town.    The proof was, that no one in the immediate neigh-borhood of the court-house or buildings or those who occupied them had ever experienced the least annoyance from the dis-posal of its sewage.    I recollect no proof that any one had ob-.served any disagreeable odor arising from that direction.    And right here it is worthy of remark that the proof showed that ordinary kitchen-refuse fluids contain quite as much deleterious matter as human excrement, and is quite as much to be feared, except, of course, when highly diluted with water.    I have .already adverted to the situation of the county buildings in that respect.    The circumstances satisfy me that the amount of fæcal matter going from the county buildings and floating undissolved and unbroken up stream into the populous parts of the town and there lodging and remaining is very small, and what does go there must, from the very nature of things, be leached, and, in a measure, purified by the action of the water.    And, con-sidering these circumstances, I think that its effect must be said to be inappreciable and very far from sufficient to create a nui-sance hazardous to public health, or to amount to a serious or .considerable contribution to what amounts at most to a very

mild nuisance. If the county buildings were situate on the upper part of the stream, above the cleansing effects of the tide, the case would be quite different, and would much resemble the Trenton case, but the actual case when examined is quite different from that.

Upon the whole case I feel constrained to say that I think the relators have failed to support the burden of proof thrown upon them by the law, and that their case fails.

This renders it unnecessary to determine the other questions above stated, whether there is any other practicable mode of disposing of the sewage in question without creating a greater nuisance, and, if there is not, then, whether the defendants are driven to the alternative placed before the defendant in the Trenton case, viz., to remove from the town. It is proper, however, for me to say, that evidence was given which proved the physical possibility of constructing a sewer from the court-house through Church street, a distance of about five hundred feet, to Bridge street, to connect there with the public sewer in that street. But it was not shown by what right and under what authority the defendants could lay down such sewer over that stretch, and none appeared. No other mode of disposal was suggested except removing the filth in closed vessels.

And as to the last point I desire simply to say, without deciding anything, that I do not understand that the board of chosen freeholders of a county, bound as they are by law to maintain a court-house, jail and place for the county records in some convenient and central place in the county, around which population naturally gathers, can be placed upon the same footing as an hotel-keeper or ordinary tradesman without whose presence the community can manage to exist.

The bill must be dismissed, but, under the circumstances of the case, without costs.